UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| INTEGRATED STORAGE CONSULTING SERVICES, INC., a Colorado corporation, | ) ) ) | Case No.: 5:12-CV-6209-EJD |
| Plaintiff, | ) ) ) | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| v. | ) ) | |
| NETAPP, INC., a Delaware corporation, | ) ) | |
| Defendant. | ) ) | **[Re: Docket No. 51]** |
| | ) ) ) | |

Presently before the Court is NetApp, Inc.'s ("Defendant" or "NetApp") Motion to Dismiss Integrated Storage Consulting Services, Inc.'s ("Plaintiff" or "ISCSI") First Amended Complaint. The Court found this matter suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b) and previously vacated the hearing. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Having fully reviewed the parties' briefings, and for the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.

## I.   BACKGROUND

Plaintiff ISCSI is a Colorado corporation with its principal place of business in Colorado. Docket No. 44, First Amended Complaint ("FAC") ¶ 2.  Defendant NetApp is a Delaware corporation with its principal place of business in California.  Id. ¶ 4.

Plaintiff markets data center and IT services on behalf of Defendant.  Id. ¶ 3.  Defendant does not typically sell directly to end users.  Id. ¶ 11.  Instead, in most cases, NetApp sells its products to NetApp distributors, who then sell NetApp products to resellers such as ISCSI, which then sell NetApp products to end user businesses.  Id.  However, NetApp works directly to promote sales to end users to ensure satisfactory sales of its products.  Id.  ISCSI invests hundreds of thousands of dollars in its sales representatives and systems engineers through payment of wages, funding training, and paying for certification tests, to be able to meet NetApp's required guidelines. Id. ¶ 12.

ISCSI has been a NetApp reseller/partner since June 2, 2004.  Id. ¶ 13.  On or about April 16, 2008, Plaintiff ISCSI and NetApp entered into a revised Reseller Authorization Agreement ("2008 Agreement").  Id.  The most recent ISCSI-NetApp written Reseller Authorization Agreement became effective on January 19, 2011 ("2011 Agreement").  Id.  In order to become a NetApp partner/reseller, a business must accept the terms and conditions of NetApp's Reseller Authorization Agreement.  Id. ¶ 14.  The Reseller Authorization Agreement is a standardized agreement that has been prepared by NetApp.  Id.

Sometime between December 2010 and January 2011, Plaintiff attempted to negotiate the terms of the 2011 Agreement.  See id. ¶¶ 17-18.  Bob Voydat of ISCSI reached out to Sam Sears of NetApp numerous times to attempt to edit the limitation of liability and other provisions of the reseller agreement because NetApp's website would not accept contract edits.  Id. ¶ 18.  In mid-January, 2011, Sam Sears told Mr. Voydat that NetApp would not amend the contract and he said that ISCSI was free to accept the agreement and remain a NetApp partner or not accept the agreement and ISCSI would no longer be a NetApp partner.  Id. ¶ 19.

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

1    A number of other documents are alleged to be incorporated by reference into the

2    Agreements, including NetApp's Partner Program Professional Services Certification Program

3    Guide, 2013 North America Commercial USPS Reseller Guide, 2008 VIP Partner Guide, and 2010

4    Reseller Guide.  Id. ¶¶ 20, 24, 25, 26.  These documents are alleged by Plaintiff to contain certain

5    contractual terms, which the Court discusses in more detail below.

6    From time to time NetApp and a partner may decide to complete an Account Teaming

7    Agreement, which further describes NetApp's and ISCSI's obligations for each registered

8    opportunity.  Id. ¶ 43.  For example, in reliance on its right to payments on all revenues from the

9    sale of NetApp products and services, on or about December 14, 2009, ISCSI and NetApp entered

10   into a Teaming Agreement ("CaridianBCT Teaming Agreement") for the provision of services to

11   CaridianBCT, an ISCSI-procured customer.  The CaridianBCT Teaming Agreement provides in

12   relevant part that the parties, ISCSI and NetApp, will act in accordance with the terms and

13   conditions set forth in the CaridianBCT Teaming Agreement.  Id.  NetApp and ISCSI entered into

14   a similar Teaming Agreement for Xilinx.  Id. ¶ 44.

15   On or about March 2007, Plaintiff and customer Tri-State entered into a Supplier Alliance

16   Agreement, as amended May, 2009, in which Plaintiff ISCSI agreed to provide to Tri-State, and

17   Tri-State agreed to pay Plaintiff for, NetApp products and services at a specified discount for a two

18   year term per each Supplier Alliance Agreement, subject to renewal.  Id. ¶ 49.

19   On or about September 27, 2010, Plaintiff and Xilinx entered into a Master Service

20   Agreement, in which Plaintiff ISCSI agreed to provide to Xilinx, and Xilinx agreed to pay ISCSI,

21   for ISCSI's sale of NetApp services to Xilinx.  Id. ¶ 50.

22   During the term of the Agreements, ISCSI was one of NetApp's lead sales agents, receiving

23   numerous awards and recognition from NetApp for the quality of its performance and volume of its

24   sales.  Id. ¶ 51.

25   On or about December 12, 2008, NetApp referred ST Micro to competing reseller Agilysys

26   and possibly other resellers, and granted Agilysys a dual registration—the very same kind of

27   registration which NetApp had already granted to ISCSI.  Id. ¶ 52.  NetApp failed to notify ISCSI

28

3

of this dual registration until after ST Micro placed approximately $1 million worth of orders for NetApp products and services.  Id.  NetApp employees Rick Congdon, Keith Macove, Tyler Beecher, Tim Maggs, and Sam Sears encouraged ISCSI to continue to work to win the business for NetApp, but had no intention of supporting ISCSI's efforts, which resulted in harming ISCSI's future business relationship with ST Micro.  Id.  Through no fault of ISCSI, ISCSI has not taken another order from ST Micro since the dual registration in December 2008.  Id.

On or about June 30, 2010, NetApp employees Rick Congdon, Keith Macove, Tyler Beecher, Todd Donaldson, Michelle Lanuza and Sam Sears referred CaridianBCT to Trace3 and possibly other resellers through Lanuza's verbal dual registration, stating to Jed Summerton, Director IT of CaridianBCT, that CaridianBCT would get the same registered pricing regardless of which partner CaridianBCT selected in response to Request for Proposals ("RFP") issued by CaridianBCT, and for which NetApp had already granted the exact same registration to ISCSI.  Id. ¶ 53.  NetApp failed to notify ISCSI of Lanuza's verbal dual registration of CaridianBCT until after CaridianBCT awarded the RFP to Trace3. NetApp employees Congdon, Macove, Beecher, Donaldson, Lanuza, and Sears encouraged ISCSI to continue to work to win the business for NetApp, but had no intention of supporting ISCSI's efforts, which resulted in harming ISCSI's future business relationship with CaridianBCT.  Id.

On or about March 30, 2011, NetApp disrupted the Tri-State bidding process by requiring Tri-State to negotiate a volume purchase agreement ("VPA") directly with NetApp so that Tri-State was free to select any partner. NetApp also informed Tri-State of the criteria that they should use to select the NetApp partner and did nothing to support ISCSI's existing registrations with Tri-State for numerous opportunities, as well as the actual bid process for Tri-State.  Id. ¶ 54.  Prior to the VPA, Tri-State had been denied VPAs in 2007 and 2009 because its annual sales volume did not meet the minimum NetApp criteria of $4 million. By requiring Tri-State to negotiate a VPA, NetApp refused to respect the price protection of registered opportunities described by the 2011 Reseller Authorization Agreement.  Id.

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

On or about September 25, 2012, NetApp referred Xilinx to World Wide Tech, Longview, e-Plus, and possibly other resellers and instructed Xilinx that ISCSI will no longer be the NetApp partner covering Xilinx.  Id. ¶ 55. NetApp declined or refused to extend several existing ISCSI registrations and thus ISCSI is no longer able to provide Xilinx with VPA pricing per the established NetApp VPA with Xilinx.  Id.

In the months preceding NetApp's dual registration of the Customers and/or referral of the Customers to other resellers, authorized representatives of NetApp specifically encouraged ISCSI to continue to sign-up new customers.  Id. ¶ 60.  ISCSI continued its efforts to sell NetApp products and services to the Customers while NetApp decided which partner would actually get the deal from the Customers.  Id. ¶ 62.

On or about June 2010, Ms. Lanuza told Jed Summerton, IT Director at CaridianBCT, that CaridianBCT would get the same registered pricing regardless of which partner CaridianBCT selected in response to a Request for Proposals ("RFP") issued by CaridianBCT.  Id. ¶ 65.  On or about July 2010, CaridianBCT selected Trace3 as its NetApp partner, resulting in no pricing disadvantage to CaridianBCT.  Id. ¶ 66.

On or about June 30, 2010, Robert Voydat, President of ISCSI, sent an e-mail request to Tyler Beecher stating his concerns regarding Ms. Lanuza's conduct encompassing past and present engagements at CaridianBCT.  Id. ¶ 68.  Mr. Beecher never responded to Mr. Voydat's repeated requests to meet and discuss the CaridianBCT situation and RFP. Mr. Beecher did not schedule a meeting until September 2010, after ISCSI's competitor, Trace3, had been awarded the CaridianBCT RFP.  Id.

On or about June 30, 2010, Robert Voydat of ISCSI repeatedly requested Messrs. Macove's and Sears' assistance to schedule a meeting with Mr. Beecher to discuss Michelle Lanuza's conduct concerning the CaridianBCT RFP registrations and pricing concerns, but Mr. Macove and Mr. Sears said that Mr. Beecher would not meet with ISCSI to discuss the matter.  Id. ¶ 69.

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

1      In response to Robert Voydat's requests to Mr. Beecher for a meeting with Beecher, on or

2   about June 30, 2010, Mr. Beecher left a voicemail for Bob Voydat stating that he [Mr. Beecher]

3   would "support ISCSI 100%." Id. ¶ 70.

4      Notwithstanding Mr. Beecher's assurance to support ISCSI 100%, and on information and

5   belief, NetApp employee Beecher intentionally allowed Ms. Lanuza to conduct a sales campaign at

6   CaridianBCT. Id. ¶ 71.

7      By April 2011, ISCSI had been the established NetApp partner at Tri-State for the

8   preceding seven years. Id. ¶ 73. Mr. Sears and Mr. Donaldson never met with ISCSI to discuss

9   how they were going to support ISCSI at Tri-State when the Tri-State Bid selection process for the

10  NetApp partner was issued in March of 2011. Id. Instead, on or about March 2011, Messrs.

11  Donaldson and Sears met with Susan Bullwinkle at Trace3 to plan the "new policy that Tri-State

12  has to sign a VPA (Volume Purchase Agreement) with NetApp." Id. ISCSI had several accepted

13  registrations with Tri-State during the bid selection process that were not honored after Tri-State

14  selected Trace3 as its NetApp partner. Id. The VPA was granted even though NetApp had refused

15  to complete VPAs in 2007 and 2009 for Tri-State because Tri-State's annual sales volume was

16  below the $4 million revenue requirement to qualify for a VPA. Id.

17     On or about June 2010, NetApp employee Sam Sears failed to extend the registration

18  request for ISCSI for the CaridianBCT RFP for an additional 180 days. Id. ¶ 74.

19     On or about April 2011, Sam Sears informed Mark Musilek of ISCSI-procured customer

20  Tri-State, that NetApp had instituted a "new policy" that required customers to sign a VPA

21  (Volume Purchase Agreement) with NetApp, after which Tri-State could select the NetApp Partner

22  that it wanted to use. Id. ¶ 75. Previously, in 2007 and again in 2009, NetApp refused to negotiate

23  a VPA with Tri-State as Tri-State's annual NetApp Sales revenue did not meet the $4+ Million

24  Annual Sales requirement necessary to establish a NetApp VPA. Id.

25     On or about April, 2011, Mr. Sears informed Mark Musilek of Tri-State that Tri-State

26  should base its partner selection on various criteria that Mr. Sears and NetApp provided to Tri-

27  State, and thereby encouraged Tri-State to award bids to another reseller. Id. ¶ 76. The first bid

28

6

1   process was to find a single supplier that would provide NetApp hardware, software and

2   maintenance.  Id.  The second bid process that NetApp suggested to Tri-State was to find a single

3   supplier that would not only provide NetApp hardware, software and maintenance, but also would

4   provide the integration support for NetApp's Information Technology Department.  Id.

5          On or about April 2011, Mr. Sears told Dick Shehan and Robert Voydat that it was Chris

6   Thomas of NetApp, who instituted this new VPA policy.  Id. ¶ 79.  On or about April 2011, Chris

7   Thomas refused to meet with Robert Voydat of ISCSI to discuss this "new VPA policy" nor would

8   Mr. Thomas meet to discuss why NetApp would not authorize the return of $14,000 worth of

9   NetApp equipment that was unopened and in its original shipping boxes, costing ISCSI $14,000

10  worth of NetApp products.  Id. ¶ 80.

11         Keith Macove encouraged ISCSI as the registered partner to continue to sell the NetApp

12  products and services to these customers knowing that a dual registration existed at ST Micro.  Id.

13  ¶ 81.  On or about December 2008, Tim Maggs encouraged ST Micro representative Lonnie

14  Phillips to state that ST Micro did not want to do business with ISCSI, the first registered partner

15  for ST Micro.  Id. ¶ 82.

16         On information and belief, on or about September 2012 Tunc Kirli informed Robert Voydat

17  of ISCSI that NetApp Management wanted to introduce ISCSI-procured customer Xilinx to a new

18  NetApp partner to work with Xilinx in San Jose and Colorado, and that ISCSI would no longer be

19  the NetApp partner working with Xilinx.  Id. ¶ 83.  On or about September 2012, Mr. Kirli stated

20  to Robert Voydat of ISCSI and Kevin Block, Tim Lentz, Bill Wong, and Dave Sims, and several

21  other employees of Xilinx that NetApp's decision to change NetApp partners was made by NetApp

22  management and Xilinx did not request it.  Id. ¶ 84.

23         On or about October 2012, Bill Wong, Kevin Block, Tim Lentz, Dave Sims and Aaron

24  Facey of Xilinx told Robert Voydat that Xilinx did not make any request to change NetApp

25  partners, as it preferred to continue to work with ISCSI as Xilinx's exclusive NetApp partner.  Id. ¶

26  85.  This same request was originally made on August 26, 2009, in the presence of Rick Congdon,

27  Sam Sears, and Tim Tutag from NetApp, as Kevin Block and Michael Allen requested that ISCSI

28

7

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

1  be the exclusive NetApp partner for all Xilinx domestic software and hardware engineering sites.

2  Id.

3          On or about September 2012, NetApp's Tunc Kirli told Robert Voydat, that in discussions

4  with NetApp management in California and with NetApp management in Denver, "it is clear that

5  ISCSI is not being supported by NetApp Management in Denver and thus the request to introduce a

6  new NetApp partner at Xilinx." Id. ¶ 86.

7          Xilinx of San Jose gave ISCSI the highest partner rankings in the most recent NetApp

8  partner survey, which took place in September 2012. Id. ¶ 87. Xilinx wanted ISCSI to be able to

9  take several Xilinx orders with annual revenue opportunities for ISCSI in excess of $2 million. Id.

10          NetApp refused to allow ISCSI to register and procure the NetApp support renewal for

11  Xilinx that was placed with NetApp directly in October 2012, valued at approximately $600,000,

12  and worth approximately $60,000 of annual profits for ISCSI. Id. ¶ 88.

13          ISCSI generated over $3 million in annual NetApp revenue from Xilinx the past two fiscal

14  years. Id. ¶ 90. With the loss of Xilinx as an ISCSI account, ISCSI will be forced to close its

15  business operations, as sustainable revenue will not be sufficient to continue ISCSI's operations.

16          By letter dated February 1, 2013, NetApp notified ISCSI that it did not plan to renew

17  ISCSI's Reseller Authorization Agreement. Id. ¶ 92.

18  **II. LEGAL STANDARD**

19          Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim in the

20  complaint with sufficient specificity to "give the defendant fair notice of what the . . . claim is and

21  the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)

22  (internal quotations omitted).  A complaint which falls short of the Rule 8(a) standard may be

23  dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

24  Dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is "proper only

25  where there is no cognizable legal theory or an absence of sufficient facts alleged to support a

26  cognizable legal theory." Shroyer v. New Cingular Wireless Servs., Inc., 606 F.3d 658, 664 (9th

27  Cir. 2010) (quoting Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)).  In considering whether

28

**United States District Court**
For the Northern District of California

8

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

the complaint is sufficient to state a claim, the court must accept as true all of the factual

allegations contained in the complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While a

complaint need not contain detailed factual allegations, it "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly,

550 U.S. at 570).

## III. DISCUSSION

Plaintiff's FAC contains twenty-one claims.  Defendant moves to dismiss all claims except

Claims 14 and 16, which the Court previously ruled were sufficiently pleaded.  Docket No. 51,

Def.'s Mot. to Dismiss at 1, n.1; Docket No. 39, July 31, 2013 Order at 23.

### a.  Rule 15 violations

As an initial matter, the Court notes that the FAC contains several claims that were not

pleaded in Plaintiff's original complaint.  In its July 31, 2013 Order, the Court dismissed all but

two of the claims in the original complaint.  Although the Court granted Plaintiff leave to amend

those claims which were dismissed, the Court did not grant Plaintiff leave to add new claims, and

Federal Rule of Civil Procedure 15 prohibited it from doing so on its own volition.  Under Rule

15(a)(1), a party "may amend its pleading once as a matter of course" within 21 days after that

pleading is served, or 21 days after service of a responsive pleading or motion under Rule 12.  "In

all other cases, a party may amend its pleading only with the opposing party's written consent or

the court's leave."  Fed. R. Civ. P. 15(a)(2).

Here, Defendant filed its first motion to dismiss the original complaint on January 30, 2013

and Plaintiff's ability to amend as a matter of course expired 21 days later pursuant to Rule

15(a)(1)(B).  Amending the complaint to add new claims on August 15, 2013 without the

stipulation of Defendant or leave of court was in contravention of Rule 15.  The new claims must

be dismissed on that ground alone.

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

Comparing the FAC to the original complaint, the new claims (the claims added in contravention of Rule 15) are Claims 1 through 5 and Claim 15.[1]  Each of the new claims is dismissed without prejudice.  However, Plaintiff is <u>not</u> granted leave to amend the new claims.  If Plaintiff wishes to replead Claims 1 through 5 and Claim 15, it must seek leave to amend by motion or stipulation under Rule 15, as well as demonstrate good cause under Rule 16.[2]

### b. Breach of the Deal Registration Contracts (Claims 6 through 9)

Plaintiff's sixth through ninth claims are for breaches of four "deal registration contracts." As described by the FAC, each deal registration contract is an agreement between Plaintiff and Defendant detailing the terms by which Plaintiff would resell Defendant's products to a named customer: CaridianBCT, ST Micro, Tri-State, and Xilinx.  FAC ¶¶ 146-183.  Plaintiff alleges that the four contracts were breached either because Defendant allowed the customers to be registered to resellers other than Plaintiff, or because Defendant encouraged the customers to work with resellers other than Plaintiff.  <u>Id.</u>  To put it another way, Plaintiff contends that the deal registration contracts provided it with exclusive rights to deal with those customers on behalf of Defendant.

Defendant denies that the four deal registration contracts are contracts at all, and argues that even if they are, the contracts do not contain the exclusivity terms alleged by Plaintiff.  The Court agrees with Defendant and finds that Plaintiff's sixth through ninth claims do not state a claim for breach of contract because Plaintiff does not plausibly allege the existence of any contractual terms that would prevent Defendant from registering customers to other resellers or encouraging customers to work with other resellers.

The deal registration contracts are not alleged to be embodied in written and integrated instruments.  Rather, Plaintiff essentially alleges that the deal registration contracts are created by

---

[1] Defendant contends that Claims 6 through 9 are also new, but they are closely related to Plaintiff's claims for breach of the 2008 and 2011 Agreements.  The Court <u>did</u> grant Plaintiff leave to amend its claims for breach of the 2008 and 2011 Agreements, and finds it appropriate to render decision on Claims 6 through 9.

[2] On September 17, 2013, the Court issued a Case Management Order, which set the deadline for amendments to the pleadings to sixty days after the entry of the order.  Docket No. 50.  Allowing further amendments would require modifying the schedule, and Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent."

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

operation of Defendant's procedures for registering a new sales opportunity to a reseller,[3] and that the terms of such contracts may be derived or inferred from various documents related to the registrations.

Each deal registration contract is alleged to contain the following four terms pertaining to reseller exclusivity:

1) Exclusive Pricing granted only to the Registered Partner;

2) Exclusive NetApp Sales and Systems Engineering Resources provided only to the Registered Partner;

3) NetApp will maintain a good working relationship with the registered partner and not interfere with or damage the partner's relationship with the partner's customer; and

4) NetApp will maintain the partner's opportunity sales campaign as confidential from all other potential non-registered partners on the deal.

Id. ¶ 36.

The terms are not expressly stated in any written document or oral statement.  Instead, Plaintiff derives the terms from statements made in a number of documents drafted by Defendant. For example, on page 13 of NetApp's 2010 Reseller Guide, attached as Exhibit A of the FAC, it is stated that "Opportunity Registration protects your sales opportunities."  According to the FAC, this language creates a contractual term under which Defendant promises that the deal registrations are exclusive to the reseller.  See id. ¶ 38.  The 2013 Reseller Guide, Exhibit E, contains identical language at page 12.  Id. ¶ 29.  The 2010 Reseller Guide also repeatedly refers to the reseller's customers as "Your Customer."  Id. ¶ 39.  The FAC appears to regard the references to "Your

---

[3] Plaintiff describes Defendant's deal registration procedure as follows: NetApp permits business partners, such as ISCSI, to register new sales opportunities through NetApp deal registration programs.  FAC ¶ 33.  Registration is a rigorous and time consuming process, subject to many initial conditions including, but not limited to: (a) completion of a detailed registration form, specifying the nature of the opportunity including the potential customer, the type of opportunity presented, the anticipated scope of work, the anticipated gross order amount, and the anticipated timeline; (b) certification that the reseller has already met certain opportunity milestones including meeting with the prospect, an initial network/storage assessment; and (c) review and sign off on the registration request by various NetApp personnel including the channel manager, account manager, sales support, and the program manager.  Id.  To qualify for registration under a NetApp deal registration program, a reseller must demonstrate that it is leading with a NetApp product, meaning that a NetApp product will be central to the proposed deal.  Id. ¶ 34.  In this way, NetApp locks resellers like ISCSI into dealing primarily with NetApp on a particular opportunity.  Id.

11

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

1    Customer" as evidence of Defendant's awareness that deal registrations will be exclusive to the

2    registering reseller.  See id.  Plaintiff identifies other, similar statements in footnote 20 of its

3    response brief, including statements made in NetApp's 2008 VIP Guide.  Docket No. 55, Pl.'s

4    Opp. to MTD at 12 n.20.

5           Plaintiff also contends that the exclusivity terms can be found in or inferred from a number

6    of emails exchanged between Bob Voydat of ISCSI and various persons with @netapp.com or

7    @salesforce.com email addresses.  The emails are attached to the FAC as Exhibits F through I.

8    The emails name the customer, list ISCSI as the "Partner/Reseller," show a potential revenue for

9    the opportunity, and provide other information.  Pl.'s Opp. to MTD at 7.  As proof that the

10   registrations are exclusive, Plaintiff points to the following statement in Exhibit I (emphasis

11   added): "Please be advised that the Deal Registration 'XOR 3020 upgrade' for customer 'Xilinx

12   Inc.' has changed the status[sic] to 'Accepted.'  The reason give[sic] for this change in status is:

13   *Exclusive*: Value Add."

14          Other than the reseller guides, the VIP guides, and the emails, the only source identified by

15   Plaintiff for the existence of the exclusivity terms is "information and belief."  FAC ¶ 36.

16          To be enforceable under California law, a contract must be sufficiently definite "for the

17   court to ascertain the parties' obligations and to determine whether those obligations have been

18   performed or breached."  Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 209 (2006) (quoting

19   Ersa Grae Corp. v. Fluor Corp., 1 Cal. App. 4th 613, 623 (1991)) (internal quotation marks

20   omitted).  "The terms of a contract are reasonably certain if they provide a basis for determining

21   the existence of a breach and for giving an appropriate remedy."  Id. (quoting Restatement

22   (Second) of Contracts § 33(2) (1981)) (internal quotation marks omitted).  The terms of a contract

23   are determined by objective rather than by subjective criteria.  Winograd v. Am. Broad. Co., 68

24   Cal. App. 4th 624, 632 (1998) (internal citations omitted).  The question is what the parties'

25   objective manifestations of agreement or objective expressions of intent would lead a reasonable

26   person to believe.  Id.  The interpretation of a written instrument is a question of law unless the

27

28
                                                    12

1    interpretation turns upon the credibility of extrinsic evidence.  Meyer v. Benko, 55 Cal. App. 3d

2    937, 943 (1976).

3         The reseller guides, VIP guides, and emails discussed above are the only "objective

4    manifestations of agreement or objective expressions of intent" alleged by the FAC as a source of

5    the exclusivity terms.  Their only other source is "information and belief," which is irrelevant

6    because the law focuses on objective, not subjective, manifestations of agreement.  Thus, any

7    exclusivity terms must necessarily be derived or inferred from the language in the above-

8    mentioned documents.  Plaintiff does not allege that the interpretation of this language turns upon

9    the credibility of extrinsic evidence.  Interpretation of the language is therefore a legal question,

10   and the Court must determine whether the language from NetApp's reseller and VIP guides and the

11   email exchanges would lead a reasonable person to believe that NetApp and ISCSI agreed that the

12   reseller-customer relationships would be exclusive to ISCSI.

13        The Court concludes that it does not.  Most telling is the fact that, other than a single

14   context-less line in Exhibit I that states "Exclusive: Value Add," the word "exclusive" does not

15   appear in any of the language identified by Plaintiff.  Also absent are any express statements that

16   Defendant will refrain from registering customers to more than one reseller or that Defendant will

17   not encourage customers to work with more than one reseller.  Plaintiff points to the multiple

18   references that "Opportunity Registration will protect your sales opportunities," arguing that when

19   Defendant allowed customers to be registered or referred to other resellers, Plaintiff was denied

20   certain pricing protection that it had been promised.  Pl.'s Opp. to MTD at 9.  However, this

21   statement is too vague to amount to an enforceable promise.  It says nothing explicit regarding the

22   rights and obligations of the parties.  The references to "Your Customer" are even less indicative of

23   a contractual promise of exclusivity.  It would be expected that a right to deal exclusively with a

24   customer would carry significance to the parties such that that right would be stated explicitly and

25   clearly.

26        Furthermore, it is the general rule that "[s]everal contracts relating to the same matters,

27   between the same parties, and made as parts of substantially one transaction, are to be taken

28

13

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

1    together.  Cal. Civ. Code § 1642.  Even assuming <u>arguendo</u> that the deal registration contracts are

2    enforceable contracts, there are other contracts that govern the reseller relationship between

3    Plaintiff and Defendant; namely, the 2008 and 2011 Agreements.  The 2008 and 2011 Agreements

4    expressly state that Plaintiff is a "non-exclusive" reseller.  This express disavowal of exclusivity

5    strengthens the conclusion that the vague language contained in the reseller and VIP guides and the

6    email exchanges cannot reasonably be interpreted as granting Plaintiff exclusive rights to deal with

7    CaridianBCT, ST Micro, Tri-State, and Xilinx.

8         For the reasons stated above, Claims 6 through 9 are DISMISSED with prejudice.

9    Dismissal with prejudice is proper because under the Court's interpretation of the written

10   instruments discussed above, Plaintiff can prove no set of facts that would entitle it to relief under a

11   claim for breach of contract on this particular theory.  Therefore, it appears to a certainty that

12   Plaintiff would be entitled to no relief under any state of facts that could be proved.  <u>Las Vegas v.</u>

13   <u>Clark County</u>, 755 F.2d 697, 701 (9th Cir. 1985).

14                    **c.   Breach of the 2008 and 2011 Agreements (Claims 10 through 13)**

15        Claims 10 through 13 are for breach of the 2008 and 2011 Agreements (collectively, "the

16   Agreements").  Plaintiff alleges that the Agreements were breached when Defendant dual-

17   registered customers to other resellers and/or when Defendant referred the customers to other

18   partners.   Plaintiff also alleges that the Agreements were constructively terminated without cause

19   or notice and that Defendant deprived Plaintiff of the benefits of the contract.  Finally, Plaintiff

20   alleges that the 2011 Agreement was breached when Defendant failed to renew the Agreement for

21   another term.

22                         **i.   Exclusivity and failure to renew**

23        A number of Plaintiff's theories of breach of the Agreements are predicated on the

24   contention that Defendant was restricted by contract from registering or referring customers to

25   other resellers.  The Agreements do not expressly bar Defendant from doing so; rather, Plaintiff

26   alleges that NetApp's VIP and reseller guides contain the exclusivity terms, and that the VIP and

27   reseller guides are incorporated by reference into the Agreements.  As discussed in the previous

28

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

*United States District Court*
*For the Northern District of California*

1     section, the VIP and reseller guides cannot reasonably be read to impose the alleged exclusivity

2     terms, and thus the Court rejects any theory of breach that is predicated on Defendant's registration

3     or referral of customers to other resellers.

4         Plaintiff also alleges that Defendant breached the Agreements by failing to renew them, but

5     this allegation is conclusory because Plaintiff points to no contractual term or source of authority

6     that would require Defendant to renew the Agreements.

7                            **ii.   Termination without cause**

8         Plaintiff also alleges that the Agreements were breached by Defendant's failure to renew

9     the Agreement for another term or by Defendant's terminating the Agreement without cause.  Both

10    the 2008 and 2011 Agreements expressly allow either party to terminate without cause upon thirty

11    days prior written notice (Section 3.0 of the 2008 Agreement and Section 4.0 of the 2011

12    Agreement).

13        As a threshold matter, Plaintiff contends that the termination provisions in the Agreements

14    are unconscionable.  Previously, the Court rejected this contention, finding that the provisions were

15    not procedurally unconscionable because Plaintiff failed to produce evidence that the mutual

16    termination provisions are the result of "oppression," and Plaintiff did not allege that it objected or

17    sought to negotiate the content of the mutual termination provisions at the time of the contract

18    formation.  Docket No. 39, 7/31/13 Order at 8.  The Court also found that the termination

19    provisions were not substantively unconscionable because Plaintiff and Defendant had the same

20    power to sever the Agreements upon 30 days prior written notice.  Id. at 9.

21        Plaintiff alleges new facts that it argues support findings that the terms are procedurally and

22    substantively unconscionable.  However, the Court notes that Plaintiff does not appear to allege

23    that Defendant exercised its right to terminate according to the termination provisions of the

24    Agreement.  Rather, Plaintiff appears to regard Defendant's registration and referral of customers

25    to other resellers as the act of termination, labeling it a "constructive termination."  See Pl.'s Opp.

26    to MTD at 14 (". . . only to have NetApp terminate ISCSI's reseller status and Customer

27    relationships without cause or notice," citing to paragraphs 12 and 57 of the FAC, which allege an

28

                                                    15

**United States District Court**
For the Northern District of California

1    "effective" termination rather than an "express" termination.)  However, nothing in the Agreements

2    or the reseller/VIP guides prevented Defendant from registering or referring customers to other

3    resellers and Plaintiff has cited no authority for why such acts are a "constructive termination."[4]

4    Thus, even if the Court were to find the termination provisions unconscionable, it does not appear

5    that the FAC actually alleges that Defendant terminated the Agreement according to the

6    termination provisions.  Under the FAC's allegations, the question is moot.

7           Accordingly, Claims 10 through 13 are DISMISSED with prejudice.  Dismissal with

8    prejudice is appropriate because Plaintiff's amendments address only the alleged unconscionability

9    of a contractual provision that was never exercised.  Plaintiff pleads no new facts that suggest the

10   existence of a viable theory for breach of the 2008 and 2011 Agreements.  Therefore, it is clear that

11   these claims could not be saved by amendment.

12                    **d.  Intentional Misrepresentation/Fraud (Claim 17)**

13          The elements of fraud are: (1) a misrepresentation (false representation, concealment, or

14   nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance;

15   (4) justifiable reliance; and (5) resulting damage.  Robinson Helicopter Co., Inc. v. Dana Corp., 34

16   Cal. 4th 979, 990 (2004).  In alleging fraud or mistake, a party must state with particularity the

17   circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b).  Malice, intent, knowledge, and

18   other conditions of a person's mind may be alleged generally.  Id.

19          Under Rule 9(b), averments of fraud must be accompanied by "the who, what, when,

20   where, and how" of the misconduct charged, and the circumstances constituting the alleged fraud

21   must be specific enough to give defendants notice of the particular misconduct so that they can

22   defend against the charge and not just deny that they have done anything wrong.  Vess v. Ciba-

23   Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal citations and quotations omitted).

24          The FAC sets forth numerous statements and identifies the person or document making the

25   statement and approximate or exact dates for when the statements were made, and attempts to

---

[4] Furthermore, the only cases the Court can locate regarding "constructive termination" are in the context of employment contracts and do not appear to be applicable here.

16

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

**United States District Court**
For the Northern District of California

1    explain why those statements are false.  Plaintiff identifies the following alleged

2    misrepresentations:

3        NetApp employee Tyler Beecher stated in a voicemail message to ISCSI's President Robert

4        Voydat on or about July 1, 2010 that he [Mr. Beecher] will support ISCSI 100%.  NetApp

5        employees Mike McLean, Keith Macove, Todd Donaldson, Tim Maggs, and Sam Sears

6        stated to Robert Voydat on or about March, 2009 that NetApp's channel policy is that

7        NetApp and ISCSI win together and lose together and if NetApp has to lose business to

8        support a registered partner NetApp will do it.  NetApp employee Sam Sears told Robert

9        Voydat regarding CaridianBCT on or about June 2, 2010 that by the spirit and letter of the

10       law, the NetApp team's time and resources should go to ISCSI, not both partners . . . On or

11       about March 2009, Messrs. Donaldson, Macove, and Sears told Robert Voydat that ISCSI

12       is a Preferred NetApp Partner and that means ISCSI has NetApp's full support.  On or

13       about June 2, 2009, Messrs. Macove and Sears told Robert Voydat that ISCSI would get an

14       8% commission on the ST Micro annual Support renewal because ISCSI sold all the

15       systems to ST Micro, but ISCSI only received a 5% commission.

16       Pl.'s Opp. to MTD at 19.  Plaintiff also points to the statement in the reseller guides that

17   "Opportunity Registration protects your sales opportunities."

18       With respect to the majority of these statements, they cannot support a claim for fraud

19   either because they are statements of opinion or because Plaintiff fails to sufficiently allege that

20   they are false.  A representation is one of opinion "if it expresses only (a) the belief of the maker,

21   without certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity,

22   or other matters of judgment."  Restatement (Second) of Torts § 538A (1977).  Expressions of

23   opinion are not generally treated as representations of fact, and thus are not grounds for a

24   misrepresentation cause of action.  Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells, 86 Cal.

25   App. 4th 303, 308 (2000); see also Gentry v. eBay, Inc., 99 Cal. App. 4th 816, 835 (2002) (a

26   statement that a positive eBay rating is "worth its weight in gold" is not an assertion of fact).  For

27   example, the statement by Mr. Beecher that he "will support ISCSI 100%" is not actionable

28

United States District Court
For the Northern District of California

17

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1   because it is merely Mr. Beecher's judgment as to the quality of the relationship between NetApp

2   and ISCSI.

3          The only statement identified by Plaintiff as a potentially actionable assertion of fact is the

4   statement to Mr. Voydat that ISCSI would receive a 8% commission on the ST Micro renewal,

5   because Plaintiff alleges that it received only a 5% commission.  However, Plaintiff fails to plead

6   reliance on this specific statement, or resulting damages from that reliance.  Instead, Plaintiff

7   pleads generally that it relied on <u>all</u> of the statements in its decision to conduct business with

8   NetApp and as a result suffered damages in excess of ten million dollars.  Because the statement

9   regarding 8% commission pertains only to a transaction involving ST Micro, and because the

10  alleged reliance and damages pertain to the entirety of the relationship between Plaintiff and

11  Defendant, Plaintiff fails to plead reliance and damages with specificity.

12         Accordingly, Plaintiff's seventeenth claim is DISMISSED with leave to amend.

13         **e.   Intentional Interference with Contractual Relations (Claims 18 and 19)**

14         To state a claim for intentional interference with contractual relations, Plaintiff must show:

15  (1) a valid contract between plaintiff and a third party, (2) defendant's knowledge of this contract,

16  (3) defendant's intentional acts designed to induce breach or disruption of the contractual

17  relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting

18  damage.  <u>CRST Van Expedited, Inc. v. Werner Enters., Inc.</u>, 479 F.3d 1099, 1105 (9th Cir. 2007);

19  <u>Reeves v. Hanlon</u>, 33 Cal. 4th 1140, 1148 (2004).

20         To show a valid contract between Plaintiff and a third party, Plaintiff points to two

21  contracts: the Supplier Alliance Agreement between Plaintiff and Tri-State (Exhibit M of the FAC,

22  Claim 18) and the Master Services Agreement between Plaintiff and Xilinx (Exhibit N, Claim 19).

23  Defendant does not dispute the validity of these contracts or its knowledge of their existence.

24         As a threshold matter, the parties dispute whether Defendant is a "stranger" to the two

25  contracts.  Under California law, as recognized by the Ninth Circuit, a claim for tortious

26  interference of contract and prospective economic advantage may only lie against "strangers" or

27  interlopers who do not have a direct and significant interest in the plaintiff's contractual

28

18

1    relationship with another individual or entity.  Fresno Motors, LLC v. Mercedes-Benz USA, LLC,

2    852 F. Supp. 2d 1280, 1293 (E.D. Cal. 2012).  It is undisputed that Defendant is not a party to the

3    contracts; what is disputed is whether Defendant's interest in the contracts is direct and significant.

4    Defendant, relying on Fresno Motors, argues that it had a direct interest in the contracts because

5    "such agreements are for the sale of NetApp's products; the sale of NetApp's products requires

6    cooperation from NetApp; and NetApp plainly stands to benefit from sales of its products.

7    NetApp's direct interest in the reseller-end-user agreements precludes ISCSI from bringing a claim

8    against NetApp for tortiously interfering with a purported reseller-end-user agreements[sic]."

9    Docket No. 58, Def.'s Reply at 14.

10        On a motion to dismiss, with few exceptions, the Court may consider only well-pleaded

11   facts in the complaint.  See Grand Opera Co. v. Twentieth Century-Fox Film Corp., 235 F.2d 303,

12   307 (7th Cir. 1956).  The FAC acknowledges that the contracts are "for the provision of NetApp

13   products and services to" Xilinx and Tri-State.  FAC ¶ 355.  The FAC also alleges that "NetApp

14   does not typically sell directly to end users.  Instead, in most cases, NetApp sells its products to

15   NetApp distributors, who then sell NetApp products to resellers such as ISCSI, which then sell

16   NetApp products to end user businesses.  However, NetApp works directly to promote sales to end

17   users to ensure satisfactory sales of its products."  FAC ¶ 11.

18        Having reviewed the relevant case law, the Court shall not dismiss Plaintiff's claims on the

19   basis of the "not-a-stranger" doctrine.  First, NetApp's interest in the contracts, at least as alleged

20   by the FAC, does not rise to the level of the defendant's in Fresno Motors.  In Fresno Motors,

21   defendant Mercedes-Benz had a right to review and approve the transfer under the contract at issue

22   in plaintiff Fresno Motors' tortious interference claim.  852 F. Supp. 2d at 1299.  Here, at least as

23   far as the FAC alleges, NetApp did not have significant control or oversight over transactions made

24   pursuant to the Supplier Alliance Agreement or the Master Services Agreement.  Second, in

25   Powerhouse Motorsports Grp., Inc. v. Yamaha Motor Corp., 221 Cal. App. 4th 867, 884 (2013), on

26   similar facts,[5] the California appellate court found that Yamaha was a "stranger" to the contract

---

[5] "The evidence shows that Yamaha was the distributor and that Yamaha would supply new motor vehicles to any
successor dealer at prices and terms determined by Yamaha and the dealer.  There is no evidence that Yamaha had any

19

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

United States District Court
For the Northern District of California

1   despite a distributor-dealer relationship.  And finally, many of the decisions applying the "not-a-

2   stranger" doctrine, including <u>Fresno Motors</u> and <u>Powerhouse</u>, were decided after discovery rather

3   than at the pleadings stage.

4          The Court turns next to the specific elements of Plaintiff's claims.

5                 **i.   Claim 18: The contract between Plaintiff and Tri-State (Supplier**

6                        **Alliance Agreement)**

7          Plaintiff alleges that Defendant induced a breach or disruption of this contract by 1)

8   referring Tri-State to ISCSI's competitor(s), which resulted in the Supplier Alliance Agreement not

9   being extended as it had been in 2009, and 2) ISCSI obtained registrations that Defendant failed to

10  honor prior to the expiration of the Supplier Alliance Agreement.

11         Defendant contends that Plaintiff fails to allege that any customers breached a contract with

12  ISCSI as a result of NetApp's actions.  Defendant also contends, and the Court agrees, that "ISCSI

13  cannot allege that customers breached their contracts with it because there are no facts showing the

14  contract terms prohibited customers from buying NetApp products from other sources."  Docket

15  No. 51, Def.'s Mot. Dismiss at 21.  Plaintiff also fails to identify anything in the contract that

16  would obligate Tri-State to grant Plaintiff an extension.

17         However, a plaintiff need not allege an actual or inevitable breach of contract in order to

18  state a claim for disruption of contractual relations.  <u>Pac. Gas & Elec. Co. v. Bear Stearns & Co.</u>,

19  50 Cal. 3d 1118, 1129 (1990).  While the tort of inducing breach of contract requires proof of a

20  breach, the cause of action for interference with contractual relations is distinct and requires only

21  proof of interference.  <u>Id.</u>

22         Plaintiff alleges that, but for Defendant's referral of Tri-State to other resellers, which was

23  deliberately intended to disrupt the agreements between ISCSI and Tri-State, the Supplier Alliance

24  Agreement would have been extended another term.  Although Tri-State was not obligated to

25  extend the contract, and Defendant was not barred from referring Tri-State to other resellers, such

26  right to determine the vehicles sent to the dealer, approve or disapprove any business practice of the dealer, assume any
    financial obligations to the dealer, or otherwise review any part of the dealer's operations.  Nor did Yamaha have any

27  rights to determine the terms or conditions of the Powerhouse/MDK contract apart from approval of the sale and
    review of MDK's financial stability as a Yamaha dealer."  <u>Id.</u>

28                                             20

1    allegations are sufficient to state a claim because Plaintiff alleges that the referrals were intended to

2    interfere with the contractual relationship.  See Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.

3    4th 26, 56 (1998) ("The tort of intentional interference with performance of a contract does not

4    require that the actor's primary purpose be disruption of the contract. . .The rule applies. . .to an

5    interference that is incidental to the actor's independent purpose and desire but known to him to be

6    a necessary consequence of his action.")

7        For example, in Tuchscher Dev. Enterprises, Inc. v. San Diego Unified Port Dist., 106 Cal.

8    App. 4th 1219 (2003), the court found that allegations that the defendant's interference caused a

9    refusal to extend a negotiating agreement's deadline could state a prima facie case for tortious

10   interference.  Id. at 1240.  Although the court ultimately found that the plaintiff's evidence showed

11   that the third party merely permitted the negotiating agreement to expire, as was its right, id. at

12   1241, the court's reasoning implies that the plaintiff could have prevailed had the evidence shown

13   that the defendant's interference actually caused the third party's refusal to extend the deadline.

14   Furthermore, in Tuchscher, as in the instant case, there were indications that the third party had

15   extended the agreement once before, an important distinction to avoid turning every contract

16   expiration into a "failure to extend."

17       For the reasons discussed above, the Court finds that the FAC states a claim for intentional

18   interference with contractual relations as to the contract between Plaintiff and Tri-State.

19   Accordingly, Defendant's motion is DENIED to the extent it seeks to dismiss Claim 18.

20           **ii.   Claim 19: The contract between Plaintiff and Xilinx (Master Services**

21                   **Agreement)**

22       Plaintiff alleges that Defendant induced a breach or disruption of this contract by 1)

23   referring Xilinx to ISCSI's competitor(s), 2) instructions to Xilinx that ISCSI would no longer be

24   the NetApp partner covering Xilinx, and 3) NetApp's declining several ISCSI registrations causing

25   ISCSI to no longer be able to provide Xilinx with VPA pricing per the established NetApp VPA

26   with Xilinx.  As a result of Defendant's actions, Plaintiff alleges that it became unable to fulfill the

27   terms of the Master Services Agreement ("MSA").

28

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS

United States District Court
For the Northern District of California

The Court finds that claim 19 is insufficiently pleaded.  Although Plaintiff alleges that the contractual relationship was disrupted because it became unable to fulfill the terms of the MSA, Plaintiff does not identify any specific contractual term or obligation.  As a result, the allegation is conclusory and not entitled to the assumption of truth.

Furthermore, having reviewed the MSA, the Court is unable to identify what, if any, obligations Plaintiff had under this contract.  The MSA, according to its terms, obligates ISCSI to "perform the duties specified in one or more Statements of Work signed by each party and incorporated into this Agreement by reference."  However, the only Statement of Work attached to the MSA is blank and includes only ISCSI's signature, and as far as the Court can tell the MSA did not actually obligate Plaintiff to do anything.

Accordingly, Claim 19 is DISMISSED with leave to amend.

**f.  Intentional Interference with Prospective Economic Relations (Claims 20 and 21)**

The elements of intentional interference with prospective economic advantage have been stated as follows: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.  LiMandri v. Judkins, 52 Cal. App. 4th 326, 339 (1997) (internal citations and quotations omitted).

Unlike a claim for intentional interference with contractual relations, a claim for interference with prospective economic relations requires proof that the defendant's conduct is wrongful apart from the interference itself.  Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 392 (1995).

As to independent wrongful conduct, Plaintiff alleges that Defendant's conduct was wrongful because of the CEDA violations alleged in Claims 1 through 5, Defendant's breach of its commitments under the VIP and reseller guides, Defendant's intentional misrepresentation, and

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendant's breach of the Xilinx Teaming Agreement and CaridianBCT Teaming Agreement.

2    Pl.'s Opp. to MTD at 24.  However, as stated above, Plaintiff fails to state a claim for violation of

3    CEDA, fails to state a claim for breach of commitments under the VIP and reseller guides, and fails

4    to state a claim for intentional misrepresentation.

5            Defendant's alleged breach of the Caridian BCT Teaming Agreement could potentially

6    support a claim for interference with prospective economic relations, but Plaintiff fails to non-

7    conclusorily allege how the breaches of the Teaming Agreements interfered with a prospective

8    economic relationship between Plaintiff and CaridianBCT.  Instead, the FAC simply alleges

9    generally that the relationships with all customers were disrupted by a number of wrongful acts

10   without adding any facts that explain how the relationships were disrupted by a particular wrongful

11   act.

12           Accordingly, Claims 20 and 21 are DISMISSED with leave to amend.

13   **IV. CONCLUSION**

14           For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART

15   Defendants' Motion to Dismiss.  Claims 1 through 5 and Claim 15 are dismissed without prejudice

16   and without leave to amend.  Claims 6 through 13 are dismissed with prejudice.  Claim 17 and

17   Claims 19 through 21 are dismissed without prejudice and with leave to amend.  Claims 14, 16,

18   and 18 are adequately pleaded and survive Defendants' Motion.

19           Plaintiff is advised that it may not add new claims or parties without first obtaining

20   Defendants' consent or leave of court pursuant to Federal Rule of Civil Procedure 15, and

21   demonstrating good cause under Rule 16.  Plaintiff is further advised that failure to amend the

22   complaint in a manner consistent with this order may result in the dismissal of this action.

23   **IT IS SO ORDERED**

24   Dated: July 9, 2014

25   _____

26   EDWARD J. DAVILA
     United States District Judge

Case No.: 5:12-CV-06209-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
DISMISS